J-A29003-22, J-A29004-22, J-A29005-22 & J-A29007-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ZADOK GRAHM HUNLY CORP. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| PRESBYTERIAN SENIORCARE AND | : | No. 671 WDA 2021 |
| LONGWOOD AT OAKMONT, INC. | : | |

Appeal from the Judgment Entered May 11, 2021
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD 17-001195

| | | |
|---|---|---|
| PRESBYTERIAN SENIORCARE AND | : | IN THE SUPERIOR COURT OF |
| LONGWOOD AT OAKMONT, INC. | : | PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD G. AUFMAN, I/T/D/B/A | : | |
| Z.G. HUNLEY CORP., ZADOK GRAHM | : | No. 672 WDA 2021 |
| HUNLEY CORP., I/T/D/B/A Z.G. | : | |
| HUNLEY CORP., JOHN R. MCCOLLUM, | : | |
| SODEXO OPERATIONS, LLC AND | : | |
| JOSEPH SEPCIC, I/T/D/B/A Z.G. | : | |
| HUNLEY CORP. | : | |
| | : | |
| | : | |
| APPEAL OF: ZADOK GRAHM HUNLY | : | |
| CORP. | : | |

Appeal from the Judgment Entered May 11, 2021
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-15-015968

| | | |
|---|---|---|
| PRESBYTERIAN SENIORCARE AND | : | IN THE SUPERIOR COURT OF |
| LONGWOOD AT OAKMONT, INC. | : | PENNSYLVANIA |
| | : | |

J-A29003-22, J-A29004-22, J-A29005-22 & J-A29007-22

|  | : |  |
| --- | --- | --- |
| v. | : |  |
|  | : |  |
|  | : |  |
| RICHARD G. AUFMAN, I/T/D/B/A | : |  |
| Z.G. HUNLEY CORP., ZADOK GRAHM | : | No. 673 WDA 2021 |
| HUNLEY CORP., I/T/D/B/A Z.G. | : |  |
| HUNLEY CORP., JOHN R. MCCOLLUM, | : |  |
| SODEXO OPERATIONS, LLC AND | : |  |
| JOSEPH SEPCIC, I/T/D/B/A Z.G. | : |  |
| HUNLEY CORP. | : |  |
|  | : |  |
|  | : |  |
| APPEAL OF: RICHARD G. AUFMAN | : |  |

Appeal from the Judgment Entered May 11, 2021
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD 15-015968

| PRESBYTERIAN SENIORCARE AND | : | IN THE SUPERIOR COURT OF |
| --- | --- | --- |
| LONGWOOD AT OAKMONT, INC. | : | PENNSYLVANIA |
|  | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
|  | : |  |
| RICHARD G. AUFMAN, I/T/D/B/A | : |  |
| Z.G. HUNLEY CORP., ZADOK GRAHM | : | No. 675 WDA 2021 |
| HUNLEY CORP., I/T/D/B/A Z.G. | : |  |
| HUNLEY CORP., JOHN R. MCCOLLUM, | : |  |
| SODEXO OPERATIONS, LLC AND | : |  |
| JOSEPH SEPCIC, I/T/D/B/A Z.G. | : |  |
| HUNLEY CORP. | : |  |
|  | : |  |
|  | : |  |
| APPEAL OF: JOSEPH SEPCIC | : |  |

Appeal from the Judgment Entered May 11, 2021
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD 15-015968

BEFORE:  BENDER, P.J.E., OLSON, J., and KUNSELMAN, J.

- 2 -

J-A29003-22, J-A29004-22, J-A29005-22 & J-A29007-22

MEMORANDUM BY BENDER, P.J.E.:　　　　　　**FILED: FEBRUARY 27, 2023**

Zadok Grahm Hunly Corp. ("Hunly") appeals at docket number 672 WDA 2021 from a May 11, 2021 judgment entered against it at GD 15-015968 following a non-jury trial, in which the trial court found, *inter alia*, Hunly liable for fraud and conspiracy.　Richard G. Aufman and Joseph Sepcic also each appeal — at docket numbers 673 WDA 2021 and 675 WDA 2021, respectively — from the same May 11, 2021 judgment entered at GD 15-015968, which also found them liable for fraud and conspiracy.　In addition, Hunly appeals at docket number 671 WDA 2021 from a separate May 11, 2021 judgment entered at GD 17-001195, in which the trial court denied its claims for breach of contract, unjust enrichment, and payment under the Contractor and Subcontractor Payment Act ("CASPA"), 73 P.S. §§ 501-516.[1]　After careful review, we affirm the judgments entered at both GD 15-015968 and GD 17-001195.

## Background

The trial court summarized the background of this matter as follows:

### I. The Parties

Presbyterian SeniorCare ("PSC") is a Pennsylvania not-for-profit corporation that provides continuum senior living and care services in fifty-three (53) separate housing communities.

---

[1] We have consolidated these cases *sua sponte* pursuant to Pa.R.A.P. 513. **See** Pa.R.A.P. 513 ("Where there is more than one appeal from the same order, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal.").

Longwood at Oakmont, Inc. ("Longwood") is one of PSC's retirement communities.

Sodexo Operations, LLC ("Sodexo") is a multi-national, interdisciplinary service provider. Sodexo offers food and senior living services including facilities management. Sodexo also has a construction division. PSC and Longwood engaged Sodexo to provide facilities management services at each of their respective campuses.

John McCollum ("McCollum") is an individual who spent most of his career running his own construction company, W.F. Cody. He was an employee of Sodexo during all times material to this litigation. Sodexo assigned McCollum to perform its obligations at both PSC and Longwood.

Richard Aufman ("Aufman") is a self-employed CPA. He is also a shareholder in several corporations, and a friend and business associate of McCollum.

Joseph Sepcic ("Sepcic") is an architect. He is also a friend and business associate of McCollum.

[Hunly] is a company, which Aufman incorporated on March 15, 2014, at the instruction of McCollum. Aufman owns twenty (20) percent of Hunly's shares. Sepcic owns the remaining shares. Aufman operated Hunly out of his home[-]office accounting practice.

Riverview Carpet & Flooring, Inc., Masco Interiors, Inc., Roland Pastucha Electric, Inc., and Tigano Painting and Wallcovering (collectively referred to hereinafter as the "Subcontractors") are all Pennsylvania Subcontractors. McCollum engaged the Subcontractors on behalf of Hunly to perform construction and finishing work on Longwood's campus.

## II. Factual and Procedural Background

On December 21, 2011, Sodexo and Longwood entered into a Facilities Management Agreement ("Longwood Management Agreement") with a term beginning January 16, 2012[,] and ending January 16, 2015. The Longwood Management Agreement required Sodexo to provide Longwood with a qualified General Manager to function as the head of Longwood's maintenance department. Thereafter, on May 24, 2012, Sodexo and PSC entered into a Facilities Management Agreement ("PSC

- 4 -

Management Agreement") with a term beginning July 10, 2012[,] and ending July 10, 2015. From 2012 to 2014, Sodexo provided Longwood with a succession of on-site managers who did not adequately fulfill their roles and were repeatedly replaced by Sodexo. Meanwhile, McCollum and Sepcic discussed forming a construction company together. During these discussions[,] McCollum recommended that Sepcic contact Aufman.

In January of 2014, while the General Manager position at Longwood was vacant, Sodexo assigned McCollum to assist Longwood with a water pipe emergency. McCollum approached Aufman and Sepcic[,] and asked them whether they were interested in performing some work for PSC. Although, at this time, Hunly had not yet been incorporated, McCollum recommended Hunly to Longwood as a potential general contractor. McCollum told Longwood that he was personally familiar with Hunly, and that Hunly came highly recommended by others. Hunly then submitted bids, which Longwood accepted as a result of McCollum's recommendations. Once the water pipes were fixed, Longwood asked Sodexo to retain McCollum at the Longwood campus. Sodexo agreed, hoping that McCollum would become indispensable to Longwood, and remedy Sodexo's deficient performance in relation to the Longwood Management Agreement.

In March of 2014, Paul Peterson ("Peterson"), Longwood's new executive director, recognizing an urgent need for renovations, opted to establish a benchmark pricing structure for new unit turnovers instead of obtaining multiple bids for each unit. Peterson tasked McCollum with obtaining estimates based on work done in the past. McCollum represented that Hunly['s] estimates were lower than Bill Bonura Cabinets' estimates.[1] Peterson accepted McCollum's representations of the estimates, and the benchmarks were set accordingly.

[1] Bill Bonura Cabinets is a contractor Longwood engaged in the past.

McCollum had a significant role in Longwood's renovations. McCollum was responsible for gathering information on both the scope of work and the pricing for each unit renovation. Additionally, McCollum was tasked with overseeing the construction work. After a project was complete, McCollum obtained the general contractor's invoices and was responsible for submitting these invoices to Longwood's Accounts Payable

Department. Even though Hunly submitted bids as a general contractor, Hunly did no actual work itself. Instead, McCollum engaged subcontractors and monitored the subcontractors['] work. Hunly had no employees or expenses.

In May of 2014, Aufman and his wife incorporated a company called Iron Bull Interiors, LLC. During this time, McCollum's performance at Longwood appeared to be satisfactory. McCollum quickly established himself as an integral part of the unit turnover process. Accordingly, Peterson deferred to McCollum, as Peterson trusted McCollum's construction experience, and McCollum's control of the invoice and capital approval process increased.

After September of 2014, McCollum's submission of invoices became increasingly sporadic. McCollum began withholding invoices for long periods of time, which made it difficult for Longwood to track costs on an ongoing basis. McCollum's practices also impacted Longwood's cashflow. Eventually, for the first time in 20 years, Longwood had to seek additional capital from its Board of Directors. This made it extremely difficult for Longwood to verify whether the invoices fell below or above Longwood's benchmarks. At the same time, Hunly hired McCollum's son Grahm, as an intern. Hunly listed Grahm as the Vice President on the company's signature card at First National Bank. Hunly also gave Grahm check writing authority on behalf of Hunly.

In October of 2014, several of [Longwood's] executives received an anonymous letter, which accused McCollum of having an improper interest in Hunly. This letter raised questions regarding Longwood's process for retaining contractors. Longwood confronted and interviewed McCollum in person about the allegations, which McCollum denied. Longwood also directed McCollum to respond to the allegations in writing, which McCollum did. Longwood thereafter asked McCollum to fill out and sign Longwood's conflict[-]of[-]interest statement. McCollum completed and signed Longwood's conflict[-]of[-]interest statement and represented that he had no conflicts of interest. Longwood also asked Aufman if McCollum had any interest in Hunly. Aufman denied that McCollum had any interest whatsoever. After Longwood concluded its investigation, Longwood provided Sodexo with all of the aforementioned information so that Sodexo could conduct its own review and investigation of the matter. Based upon Longwood's investigation, and McCollum's and Aufman's assurances,

- 6 -

Longwood's suspicions were mitigated, and Longwood took no further action.

In December of 2014, Longwood discovered a large number of delinquent Hunly invoices and thereafter informed Sodexo of McCollum's problematic invoice practices. A few Sodexo executives expressed their distrust of McCollum via internal correspondences. However, Sodexo's executives never shared their opinion of McCollum with Longwood. Meanwhile, Aufman formed Fairbanks Holding Co., Inc., for McCollum, and Grahm took ownership of Iron Bull, LLC, which was originally formed by Aufman and Aufman's wife. On December 9, 2014, Grahm opened a bank account for Iron Bull, LLC. On the same day, McCollum opened a bank account for Fairbanks Holding Co., Inc.[] The authorized signatories for Fairbanks Holding Co., Inc., include McCollum (as president), McCollum's wife, Regina (as secretary), and Grahm (as vice president).

In January of 2015, the Longwood Management Agreement was set to automatically renew. However, Longwood sent written notice to Sodexo that Longwood was opting out of the automatic renewal and terminating the Longwood Management Agreement. Nevertheless, because the PSC Management Agreement was not set to expire until July of 2015, Longwood decided that it preferred to end all relationships with Sodexo at the same time as PSC. Although Sodexo offered Longwood an agreement with an expanded scope, Longwood declined. Longwood instead purs[u]ed a limited extension of the Longwood Management Agreement and began negotiations with Sodexo for the same. On January 16, 2015, Longwood and Sodexo entered into a consulting agreement ("Longwood Consulting Agreement"). The Longwood Consulting Agreement provided that Sodexo would continue providing services at the Longwood campus until the end of June[] 2015. McCollum continued to manage and oversee Longwood's renovations, and Sodexo continued to provide oversight and supervision over McCollum's work at Longwood.

By March of 2015, McCollum began shredding excessively large quantities of paper. McCollum discarded the shredded paper in various trash cans around Longwood's campus. In total, McCollum's shredded paper filled about five full trash cans per day. Meanwhile, Grahm systematically wrote checks on behalf of Hunly to Iron Bull, LLC[,] totaling $975,000.00. Grahm then wrote checks from Iron Bull, LLC to Fairbank[s] Holding Co., Inc., totaling $868,000.00. Of the funds transferred via check from

Iron Bull, LLC to Fairbanks Holding Co., Inc., $111,989.50 went to Grahm personally. Grahm also wrote a check totaling $33,000.00 directly to himself. Iron Bull, LLC transferred another $10,000.00 to W.F. Cody.

On April 16, 2015, McCollum had a verbal altercation with a Longwood employee. Thereafter, on May 1, 2015, Longwood hired John Bulger ("Bulger") as a Facilities Director. Although McCollum was originally supposed to help Bulger transition into his new role, due to McCollum's verbal altercation with a Longwood employee, Longwood asked Sodexo to remove McCollum from Longwood's campus. On his own, Bulger attempted to understand where Longwood's renovations projects stood in terms of cost and completion status. However, Bulger's mission was frustrated because Bulger could not find adequate records. Additionally, there remained a large number of Hunly invoices, which Hunly claimed were overdue.

On May 22, 2015, Bulger convened a meeting with Aufman and several disgruntled Subcontractors whom Hunly had not paid. The end result of the meeting was that Aufman agreed to provide Bulger with additional information so that Bulger could verify Hunly's invoices. However, Aufman later refused to provide the additional documentation and continued to demand payment. While searching for Hunly's invoices, Longwood discovered numerous invoices that McCollum had not submitted during his tenure at Longwood. Some of these invoices were 18[-]months old.

While the Subcontractors complained that they were not being paid, Hunly refused to pay them until Longwood paid Hunly. Longwood needed to avoid delays in the renovation process so that Longwood's apartments were ready in time for new occupants. Accordingly, while Bulger's investigation of the Hunly invoices remained ongoing, Longwood began issuing large checks to Hunly in reliance upon Hunly's promise to pay the Subcontractors within seven (7) to ten (10) days. Nevertheless, despite receiving $613,069.50 from Longwood after McCollum left, Hunly did not pay the Subcontractors and continued to demand more money from Longwood. In order to keep the renovation projects moving along, Bulger assured the Subcontractors that Longwood would "make good on Hunly's debt." Based upon Bulger's assurance, the Subcontractors continued working.

Bulger began to suspect that Hunly severely overcharged Longwood, as Bulger discovered that he could perform the role of the general contractor himself without need for an outside general contractor like Hunly. While Hunly threatened Longwood with litigation, Longwood retained counsel and withheld any more payments to Hunly for Hunly's allegedly outstanding invoices. Eventually, on September 14, 2015, PSC and Longwood initiated the instant action. Through discovery, PSC and Longwood discovered the extent of McCollum and Hunly's relationship, in addition to the extent of McCollum's and Hunly's overcharges and fraud.

PSC and Longwood's original complaint was docketed at GD 15-015968. On March 20, 2017, PSC and Longwood[] filed their First Amended Complaint. PSC and Longwood's First Amended Complaint is their final operative complaint. PSC and Longwood's final operative complaint alleged five counts. Counts I is for Breach of Contract, and it alleges that Sodexo breached both the Longwood Management Agreement and the PSC Management Agreement. Count II is for Breach of Contract with a Demand for Indemnification. Count II alleges that Sodexo breached the indemnification clauses of both the Longwood Management Agreement and the PSC Management Agreement. Count III is for Unjust Enrichment, and it alleges that Hunly received inequitably high sums of money in relation to the actual work that Hunly performed. Count IV is for Fraud, and it alleges that Hunly, Aufman, Sepcic, and McCollum were overpaid for their services as a result of fraudulent misrepresentations. Finally, Count V is for Conspiracy, and it alleges that Hunly, Aufman, Specic [*sic*], McCollum, and Sodexo conspired to defraud both PSC and Longwood.

On June 28, 2017, following PSC and Longwood's First Amended Complaint, Sodexo filed its final operative counterclaims to its Answer, New Matter, and Counterclaims to First Amended Complaint. In total, Sodexo asserted four counterclaims. Counterclaim I is for Breach of Contract, and it alleges that Longwood breached the Longwood Management Agreement by failing to pay software licensing fees. Counterclaim II is for Unjust Enrichment, and it alleges that Longwood was unjustly enriched because Longwood was able to use Sodexo's software without paying the requisite fees. Counterclaim III is for Breach of Contract, and it alleges th[at] PSC breach[ed] the PSC Management Agreement for failing to pay software licensing fees. Finally, Counterclaim IV is for Unjust Enrichment, and it alleges

- 9 -

that PSC was unjustly enriched because PSC was able to use Sodexo's software without paying the requisite fees.

On January 23, 2017, Hunly filed a complaint against PSC and Longwood at GD 17-00195. On March 16, 2017, this [c]ourt consolidated Hunly's claims at GD 17-001195 with the action at GD 15-015968. On October 3, 2017, Hunly filed its Second Amended Complaint, which [is] its final operative complaint. Hunly's final operative complaint alleged three [c]ounts. Count I is for Breach of Contract, and it alleges that … PSC and Longwood breached various written and oral contracts with Hunly because PSC and Longwood failed to pay Hunly for outstanding invoices for Hunly's services as a general contractor. Count II is for Unjust Enrichment, and it alleges that PSC and Longwood were unjustly enriched because they received the benefit of the Subcontractors' work without paying Hunly's outstanding invoices. Count III alleges that PSC and Longwood are liable to Hunly pursuant to [CASPA] for failing to pay Hunly's outstanding invoices.

On September 7, 2018, the Subcontractors filed a Complaint against all the above-mentioned parties at GD 18-012048. Each of the four Subcontractors alleged a separate count for Breach of Contract against all parties for failing to pay the invoices of the Subcontractors. Additionally, each of the four Subcontractors alleged a separate count for Conspiracy to Commit Fraud against Sodexo, McCollum, Aufman, and Hunly. On November 28, 2018, this Court consolidated the Subcontractors' claims at GD 18-012048 with the actions at GD 17-001195 and GD 15-015968. On February 7, 2019, the Subcontractors filed their Amended Complaint, which is the Subcontractors' final operative complaint. The Subcontractors' final operative complaint remains unchanged with regards to the counts for breach of contract. However, the Subcontractors' final operative complaint substituted the four counts for Conspiracy to Commit Fraud with four counts of Unjust Enrichment against PSC and Longwood. All of the counts for Unjust Enrichment allege that both PSC and Longwood were unjustly enrich[ed] because PSC and Longwood failed to provide compensation to the Subcontractors in relation to completed construction work.

On February 21, 2019, PSC and Longwood filed a crossclaim[,] attempting to shift liability for the Subcontractors' claims to Sodexo, McCollum, Hunly, Aufman, and Sepcic. Then, on February 27, 2019, Hunly filed its own crossclaim[,] attempting to shift liability for the Subcontractors' claims to PSC and Longwood.

In [March] of 2019, this [c]ourt held a non-jury trial[,] in which all the parties had a full and adequate opportunity to present their respective cases. On April 9, 2020, this [c]ourt issued a Memorandum and Non-Jury Verdict. Shortly thereafter, on April 14, 2020, this [c]ourt issued an Amended Memorandum and Non-Jury Verdict (dated April 9, 2020), which detailed the verdicts described below.

With regard to PSC and Longwood's affirmative claims in their First Amended Complaint at GD 15-015968, this Court held: (1) in favor of PSC and Longwood and against Sodexo on Count [I] (Breach of Contract); (2) in favor of Sodexo and against PSC and Longwood on Count II (Demand for Indemnification); (3) in favor of Hunly, Aufman, and Sepcic and against PSC and Longwood on Count III (Unjust Enrichment); and (4) in favor of PSC and Longwood and against Hunly, Aufman, Sepcic, Sodexo, and McCollum on Count IV (Fraud) and Count V (Conspiracy). [For these claims, the trial court determined that Longwood is entitled to $933,220.71 from all defendants, jointly and severally.]

With regard to Sodexo's counterclaims against PSC and Longwood at GD 15-015968, this [c]ourt held: (1) in favor of Sodexo and against Longwood on Sodexo's Counterclaim I (Breach of Contract) in the amount of $4,409.65; (2) in favor of Longwood and against Sodexo on Sodexo's Counterclaim II (Unjust Enrichment); (3) in favor of Sodexo and against PSC on Sodexo's Counterclaim III (Breach of Contract) in the amount of $31,666.47; and (4) in favor of PSC and against Sodexo on Sodexo's Counterclaim IV (Unjust Enrichment).

With regard to Hunly's affirmative claims against PSC and Longwood at GD 17-001195, this [c]ourt held: (1) in favor of PSC and Longwood and against Hunly on Count I (Breach of Contract for Unpaid Invoices)[;] (2) in favor of PSC and Longwood and against Hunly on Count II (Unjust Enrichment for Unpaid Invoices); and (3) in favor of PSC and Longwood and against Hunly on Count III (Violation of the Pennsylvania Contractor and Subcontractor Payment Act).

With regard to the Subcontractors' claims against PSC and Longwood at GD 18-012048, this [c]ourt held: (1) in favor of Riverview Carpet & Flooring, Inc., and against Longwood on Count I (Breach of Contract) in the amount of $82,571.97; (2) in favor of Masco Interiors, Inc., and against Longwood on Count II (Breach of Contract) in the amount of $218,135.00; (3) in favor

of Roland Pastucha Electric, Inc., and against Longwood on Count III (Breach of Contract) in the amount of $32,245.00; [(4)] in favor of Tigano Painting and Wallcovering and against Longwood on Count IV (Breach of Contract) in the amount of $86,597.00; [(5)] in favor of Longwood and against the Subcontractors on Counts V-VIII (Unjust Enrichment); [(6)] in favor of Longwood and against Hunly, Aufman, Sepcic, McCollum, and Sodexo on Longwood's Crossclaim;[2] and [(7)] in favor of Longwood and against Hunly on Hunly's Crossclaim.

> [2] This [c]ourt ordered Hunly, Aufman, [and] Sepcic[] to contribute to the sums that Subcontractors shall collect from Longwood by virtue of this verdict.

Following this [c]ourt's April 14, 2020[] Amended Memorandum and Non-Jury Verdict, the parties filed Motions for Post-Trial Relief. On September 29, 2020, after hearing oral argument, and after due considerations of the parties' briefs, this [c]ourt issued an order addressing the parties' Motions for Post-Trial Relief. This [c]ourt's September 29, 2020 order denied Sodexo's, Hunly's, McCollum's, Aufman's, and Sepcic's Motions for Post-Trial Relief. This [c]ourt's September 29, 2020 order also denied PSC's and Longwood's Motion for Post-Trial Relief, at least to the extent that PSC and Longwood requested an additional award for punitive damages, and a stay of execution pursuant to Pa.R.C[iv].P. 3121. This [c]ourt's September 29, 2020 order, nonetheless, granted PSC and Longwood's Motion for Post-Trial Relief to the extent that PSC requested that the April 14, 2020 Amended Non-Jury Verdict be amended further to reflect this [c]ourt's decision as explained in this [c]ourt's April 14, 2020 Amended Memorandum. Accordingly, Sections 4(a)-(d) of this [c]ourt's Amended Non-Jury Verdict[,] dated April 14, 2020[,] were amended to include Hunly, Aufman, Sepcic, and McCollum as parties against whom each Subcontractor was awarded damages [for breach of contract].[2] Section 4(f) of this [c]ourt's Amended Non-Jury Verdict[,] dated April 14, 2020[,] was also amended to read: "In favor of Longwood and against Hunly, Aufman, Sepcic, McCollum, and Sodexo on Longwood's Crossclaim. Hunly, Aufman, Sepcic, McCollum, and Sodexo shall, jointly and severally, indemnify

---

[2] Sodexo was not included, as the Subcontractors had withdrawn their breach-of-contract claim against Sodexo by the time of trial. *See* N.T. Trial, 3/13/19, at 1747 (Subcontractors' stipulating that they have no breach-of-contract claim against Sodexo, as they "had no contract with Sodexo").

Longwood for all amounts [Longwood] pays or are otherwise collected from [Longwood] by the Subcontractors pursuant to this Verdict."

On May 7, 2020, the Subcontractors also filed a Motion to Mold the Verdict to include pre-judgment and post-judgment interest. The Subcontractors' Motion to Mold the Verdict was heard at the same time as the other parties' Motions for Post-Trial Relief. In a separate order dated September 29, 2020, but filed on October 1, 2020 (the "October 1, 2020 order"), this [c]ourt granted the Subcontractor's Motion to Mold the Verdict. Accordingly, this [c]ourt's October 1, 2020 order molded the above[-]mentioned verdicts awarded in favor of the Subcontractors to include pre-judgment and post-judgment interest. Specifically, the final amounts of the verdicts awarded in favor of the Subcontractors were molded as follows: (1) in favor of Riverview Carpet & Flooring, Inc., and against Longwood, Hunly, Aufman, Sepcic, and McCollum on Count I (Breach of Contract) in the amount of $156,756.00; (2) in favor of Masco Interiors, Inc., and against Longwood, Hunly, Aufman, Specic [*sic*], and McCollum on Count II (Breach of Contract) in the amount of $287,477.04; and (3) in favor of Tigano Painting and Wallcovering and against Longwood, Hunly, Aufman, Sepcic, and McCollum on Count IV (Breach of Contract) in the amount of $114,531.95.

On February 2, 2021, after reviewing Longwood's and PSC's Petition for Award of Attorney's Fees and Litigation Expenses Including Pre-Hearing Statement, and after a hearing on the same, this [c]ourt issued an order granting Longwood and PSC attorney's fees and expenses totaling $1,062,053.67.

Trial Court Opinion at GD 15-015968 ("TCO"), 4/18/22, at 1-13 (some original brackets changed to parentheses; some brackets added).

On May 11, 2021, the trial court entered separate judgments on each trial court docket (*i.e.*, GD 15-015968, GD 17-001195, GD 18-012048).[3] Each

---

[3] Some of the parties involved in this matter had prematurely filed appeals without judgment being entered. This Court quashed those appeals, directing the parties to appeal after the trial court entered separate judgments at each trial court docket. **See** Trial Court Judgment at GD 15-015968, 5/11/21, at Exhibit A; Trial Court Judgment at GD 17-001195, 5/11/21, at Exhibit A.

separate judgment contained only the trial court docket number at which the judgment was filed and related only to the claims associated with that particular docket number.

On June 10, 2021, Hunly, Aufman, and Sepcic each filed a timely notice of appeal from the judgment entered at trial court docket GD 15-015968.[4, 5] On the same day, Hunly also filed a timely notice of appeal from the judgment entered at trial court docket GD 17-001195.[6] The trial court subsequently directed each of them to file a Pa.R.A.P. 1925(b) concise statement for their respective appeals, and they all timely complied.

### Hunly's Appeal at 672 WDA 2021

We turn first to Hunly's appeal at docket number 672 WDA 2021. There, Hunly raises the following issues for our review:

1. Do the record facts and law support the trial court's finding of fraud by … Hunly?

2. Do the record facts and law support the trial court's finding of conspiracy by … Hunly?

3. Did Longwood waive its claims against [Hunly]?

---

[4] In the captions of these notices of appeal, only the trial court docket number GD 15-015968 was listed.

[5] In addition to the appeals addressed in this writing, there are multiple other appeals related to this matter before our Court at docket numbers 670 WDA 2021, 674 WDA 2021, 676 WDA 2021, 677 WDA 2021, and 733 WDA 2021.

[6] In the caption of this notice of appeal, Hunly only listed GD 17-001195.

Hunly's Brief at 672 WDA 2021 ("Hunly's Brief I") at 7.[7]

## Hunly's First Issue

In Hunly's first issue, Hunly contests the trial court's findings related to fraud in a two-prong argument.  To begin, Hunly argues that the evidence was insufficient to prove fraud.  Specifically, it states that "the record does not reveal any material misrepresentation by [Hunly] or any intent by [Hunly] to cause Longwood to rely on any misrepresentation."  Hunly's Brief I at 18 (citation omitted).  Further, Hunly says that, even if McCollum had somehow misrepresented or failed to disclose an association between McCollum, Hunly, Aufman, and Sepcic, "the record does not prove that Longwood relied on any such misrepresentation.  To the contrary, Longwood agreed to pay the prices charged by [Hunly] because those prices were lower than those charged by

---

[7] Longwood urges us to quash Hunly's appeal due to, *inter alia*, the vagueness and breadth of Hunly's claims, and its failure to follow the Rules of Appellate Procedure.  **See** Longwood's Brief at 672 WDA 2021 at 24-31.  While we admonish Hunly for its lack of specificity and non-compliance with our Rules of Appellate Procedure — particularly with respect to its deficient reproduced record that primarily contains only its own trial exhibits — we decline to quash its appeal, as we can sufficiently identify the issues raised by Hunly.  **See Grimm v. Universal Medical Services, Inc.**, 156 A.3d 1282, 1284 n.2 (Pa. Super. 2017) (declining to quash appeal because the appellants' "failure to file a reproduced record does not 'preclude our ability to properly evaluate and address the substantive arguments advanced by the parties'") (citation omitted); **Kern v. Kern**, 892 A.2d 1, 6 (Pa. Super. 2005) ("[A]s a practical matter, this Court quashes appeals for failure to conform to the Rules of Appellate Procedure only where the failure to conform to the Rules results in the inability of this Court to discern the issues argued on appeal.  [The a]ppellants' failure to conform to the Rules of Appellate procedure regarding [their] brief cannot be condoned, but [the a]ppellants' failure has not hampered our review.") (citation omitted).

Bonura [Cabinets] and were within the benchmarks set by Longwood." *Id.* (citations omitted). Further, Hunly advances that, "whatever may have been the associations between McCollum, Aufman, Sepcic, and [Hunly], the fact remains that Longwood — after determining as early as October 2014 that there was some association — continued to use and pay [Hunly] through the summer of 2015." *Id.* at 19 (citations omitted). Thus, according to Hunly, "Longwood knew of business and social associations among the [d]efendants but Longwood continued to use [Hunly's] services. Longwood did not care about any associations because Longwood was receiving high-quality renovations at prices below what the prior contractor had charged." *Id.* (citations omitted).

In addition to contesting Longwood's failure to prove the elements of fraud, Hunly challenges the trial court's damages award relating to the fraudulent conduct. For a fraudulent overcharge, Hunly maintains that "[t]he measure of damages [is] the difference between the fair market value and any overcharge[,]" and complains that "Longwood did not establish the fair market value of its renovations." *Id.* at 20 (citation omitted). Instead of establishing the fair market value of the renovations, Hunly says Longwood "incorrectly sought to show that [Hunly's] mark-up/profit was somehow too high and was somehow improper in light of a national average of mark-ups as calculated in a study that was referenced by one or both of Longwood'[s] experts." *Id.* at 20-21 (citation omitted). Hunly says that the study relied on by Longwood's damages expert — Brian Kassalen — presented an average

mark-up for commercial and industrial jobs, not residential projects, and failed to consider numerous variables that affect the mark-ups on construction work, such as market conditions, geography, project size, etc. *Id.* at 21. Further, Hunly suggests that Kassalen "ignored numerous business" expenses that Hunly had paid, which in turn affected the calculation of its profit margin. *Id.*[8] Finally, Hunly complains that "Longwood did not demonstrate [that] there was even a single general contractor on the open market who would have charged less than [Hunly,]" and claims that "Longwood itself confirmed that [Hunly] was charging the lowest available prices." *Id.* at 20 (citation omitted).

We apply the following standard and scope of review to challenges to a non-jury verdict:

> Our standard of review in non-jury trials is to assess whether the findings of facts by the trial court are supported by the record and whether the trial court erred in applying the law. Upon appellate review[,] the appellate court must consider the evidence in the light most favorable to the verdict winner and reverse the trial court only where the findings are not supported by the evidence of record or are based on an error of law. Our scope of review regarding questions of law is plenary.

*Woullard v. Sanner Concrete and Supply*, 241 A.3d 1200, 1207 (Pa. Super. 2020) (citations omitted).

This Court has previously stated that:

> In order to prove fraud[,] the following elements must be shown: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent

---

[8] In its brief, Hunly only specifically identifies a $20,000 payment made to supplier, Abbey Glass, that Kassalen purportedly ignored. Hunly's Brief I at 21.

of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

***Milliken v. Jacono***, 60 A.3d 133, 140 (Pa. Super. 2012) (*en banc*) (citation omitted).

Moreover,

[f]raud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. It has been said that fraud may induce a person to assent to something which he would not otherwise have done, or it may induce him to believe that the act which he does is something other than it actually is. To be actionable, the misrepresentation need not be in the form of a positive assertion. It is any artifice by which a person is deceived to his disadvantage. It may be by false or misleading allegations or by concealment of that which should have been disclosed, which deceives or is intended to deceive another to act upon it to his detriment. It is well settled that fraud is proved when it is shown that the false representation was made knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false. It has also been established that the deliberate nondisclosure of a material fact amounts to a culpable misrepresentation no less than does an intentional affirmation of a material falsity. … A misrepresentation is material when it is of such a character that if it had not been made, the transaction would not have been entered into.

***See Delahanty v. First Pennsylvania Bank, N.A.***, 464 A.2d 1243, 1251-52 (Pa. Super. 1983) (cleaned up).

Here, the trial court found that Hunly committed fraud, explaining:

[T]he elements of fraud have undoubtedly been met. … McCollum, Hunly, Aufman, and Sepcic[] each made various material misrepresentations, the most pertinent of which are as follows: First, between January and February of 2014, McCollum represented that Hunly was a general contractor and came highly recommended by other contractors. However, Hunly was not incorporated until March of 2014, and thus[,] there was no basis

for these assertions. Second, in both an attempt to financially benefit from the recommendation of Hunly, as well as to create the impression of a competitive bidding process, McCollum persuaded Longwood to hire and pay Hunly as a general contractor via misrepresenting that Hunly charged significantly less than Bonura Cabinets, a contractor whom Longwood successfully engaged in the past. However, Hunly's prices were not fair in comparison to other contractors, and the bidding process was ultimately illusory. Third, McCollum misrepresented that Hunly was performing the tasks of general contractor. In reality, McCollum performed all work to the contract, Hunly merely operated as a shell, and McCollum extracted the lion's share of the Longwood profits. Fourth, despite being friends and business partners for many years, both McCollum and Aufman denied the existence of any conflict of interest.

The parties had a mutual understanding that McCollum would utilize his construction expertise to obtain fair prices for Longwood. Because McCollum was responsible for gathering information regarding the scope of the work for each unit, McCollum also presented Hunly's bids for each unit. McCollum would then create and sign a capital request form, which McCollum sent to Peterson for final approval. Peterson verified the scope of work and the amount of money needed, and then approved the capital request forms. Peterson deferred to McCollum's opinions due to McCollum's purported, superior construction experience.

McCollum thereafter managed Hunly's invoices and submitted them to Longwood's Accounts Payable Department. McCollum's irregular presentation of Hunly's invoices towards the third quarter of 2014 (and onwards) made it difficult to verify whether final invoices were in conformity with the original capital request form, which were approved by Peterson. Throughout this process, Hunly charged an exorbitant mark-up, while not performing any actual work itself. In fact, all the work Hunly was supposed to perform was instead performed by McCollum, as it was McCollum who engaged the Subcontractors and monitored their work, arguably on Hunly's behalf.

McCollum also eventually received most of Hunly's profits, as Grah[m] extracted $900,000.00 from Hunly, and then issued checks to Fairbanks Holding Co., Inc. (a company that Aufman formed for McCollum) totaling $868,000.00. Furthermore, Hunly made payments to McCollum's other company, W.F. Cody, in the amount of $282,075.00.

TCO at 16-17 (internal citations omitted).

Further, with respect to Hunly's argument that Longwood learned of the associations between the defendants through an anonymous letter sent in October of 2014, and nevertheless continued to use Hunly's services, the trial court opined:

> The anonymous letter outlining McCollum's conflict of interest is not sufficient to defeat Longwood's justifiable reliance. Reliance is not justifiable if the recipient of the misrepresentations knows it to be false, or if its falsity is obvious. *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 2[07-]08 ([Pa.] 2007). Although the letter did raise suspicions regarding the conflict of interests, there was no actual knowledge and the falsity was not obvious. Longwood took reasonable steps to investigate the matter, including confronting McCollum and Hunl[y]. McCollum and Hunl[y] made further misrepresentations regarding the conflict of interest in order to convince Longwood that the allegations were false. Longwood was only able to uncover the fraud when John Bulger replaced McCollum and through discovery obtained in this litigation. Therefore, Longwood's justifiable reliance persisted through the final payment made to Hunl[y].

Trial Court Memorandum and Non-Jury Verdict ("TCMNV"), 4/14/20, at 15-16.

The record supports the trial court's factual findings, and we agree with its legal conclusion that the elements of fraud have been met. Hunly represented that it was an established general contractor, had no conflicts of interest, and charged reasonable prices. In making these representations, Hunly knew that they were false and made them with the intent to mislead Longwood. Longwood, in turn, justifiably relied on these misrepresentations, causing it to overpay for construction work.

As for Hunly's argument that the trial court's damages award of $933,220.71 was improper, no relief is due on this basis either. With respect to these damages, the trial court conveyed:

In this case, McCollum's illusory bidding process, his deliberate mismanagement of Hunly's vague invoices, and his destruction of documents made it impossible to calculate the actual value of Hunly's services on a per unit basis. Thus, Longwood could not completely rely on the poorly kept, incomplete, and unaudited invoices that Longwood obtained through discovery. Longwood was instead forced to take an aggregated approach based upon Hunly's total income and Hunly's total expenses. Longwood had to use these figures in order to assess what Longwood *actually paid* in comparison to what Longwood *should have paid*. Longwood's aggregate approach was appropriate in this circumstance because Longwood was Hunly's sole client, and Hunly did not have any legitimate costs (with the exception of the Subcontractors' invoices).

In support of its damages, Longwood submitted the expert testimony of Brian Kassalen ("Kassalen"), a partner at the accounting firm Arnett Carbis Toothman. Kassalen is a Certified Public Accountant, and he is certified in financial forensics. By examining the difference between Hunly's legitimate costs, and Hunly's total income, Kassalen concluded that Hunly charged Longwood a mark[-]up of approximately 130%. In order to calculate the actual value of Hunly's services, *i.e.*, the amount Longwood should have paid, Longwood took a reasonable mark[-]up that a general contractor would charge according to fair industry standards, and then added that mark[-]up to Hunly's contract costs. Kassalen derived the average industry standard mark[-]ups from data provided by the Risk Management Association (RMA) and other industry data. Longwood further submitted persuasive authority regarding other instances where courts accepted RMA data for the purpose of calculating reasonable profit margins in lieu of a company's unreliable recorded data. Kassalen's reasonable mark[-]ups were further corroborated by Michael Dell'Isola, Longwood's construction expert.

Considering all of the above[-]mentioned facts, and given that this [c]ourt found both Kassalen and Dell'Isola to be properly qualified

- 21 -

> experts, this [c]ourt determined that Longwood's method for calculating damages was reasonable under the circumstances. Any uncertainty in the damage calculations is a direct result of McCollum's and Hunly's fraudulent actions. Accordingly, this [c]ourt correctly found that Longwood incurred damages in the amount of $933,220.70.

TCO at 20-21 (footnote and internal citation omitted; emphasis in original).

We agree with the trial court that Longwood's method for calculating damages was reasonable under the circumstances. To the extent Hunly insists that the measure of damages for a fraudulent overcharge is the difference between the fair market value and the overcharge, it cites only one case in support of that proposition: *Sands v. Forrest*, 434 A.2d 122 (Pa. Super. 1981). In *Sands*, the buyers purchased a farm for $85,000, with $60,000 of that sum allocated for the real estate and the remaining $25,000 allocated for certain personalty. *Id.* at 123. After taking possession of the farm, the buyers discovered that it needed substantial repair and that various items of personalty that they were supposed to receive were missing. *Id.* The buyers subsequently brought a fraudulent misrepresentation action against the sellers, in which the buyers claimed as damages the costs of making the necessary repairs to the real estate and the costs of acquiring the missing personalty. *Id.*

At trial, the buyers proffered evidence that the sellers had represented that the property was in good condition and that certain items were being sold with the real estate. *Id.* at 123-24. They also attempted to show the cost of repairing the premises and replacing the missing personalty, to which the sellers objected on the basis that the cost of making repairs was not the

correct measure of damages. *Id.* at 124. The trial court agreed with the sellers, ascertaining that the correct measure of damages was the difference between the actual value of the property and its value if it had been as represented by the sellers. *Id.* Based on the trial court's ruling, the buyers' counsel sought to amend the complaint and offered to produce evidence of the value of the property in the condition found by the buyers when they took possession; however, the trial court did not allow an amendment and a directed verdict was entered in favor of the sellers. *Id.*

The buyers appealed. On appeal, we recognized that "[t]he law in Pennsylvania is clear that in an action for fraud and deceit the measure of damages is the difference in value between the real, or market, value of the property at the time of the transaction and the higher, or fictitious, value which the buyer was induced to pay for it." *Id.* (citations omitted). We went on to determine that the trial court was correct about the proper measure of damages, but nevertheless erred in entering a directed verdict in favor of the sellers and in not permitting the buyers to amend their complaint. *Id.* at 124-25.

In the case at bar, the trial court opined that "***Sands*** is distinguishable from the case at hand because it involved the fraudulent *sale* of a property and not construction that was performed on a property." TCMNV at 21 (emphasis in original). We agree. This matter did not involve the sale of property but instead concerned renovations done to various units at Longwood's facility. *Cf. Peters v. Stroudsburg Trust Co.*, 35 A.2d 341, 343

(Pa. 1944) ("[T]he measure of damages in an action for deceit in **the sale of property** is the loss which the fraud inflicts, that is, the difference between the real, or market, value of the property at the time of the transaction and the higher, or fictitious, value at which it was purchased.") (citations omitted; emphasis added). Further, although Kassalen did not evaluate the fair market value of the renovations, his calculations nevertheless reflected the difference between the value Longwood should have paid for a general contractor's services relating to its renovation projects and the value it actually paid due to Hunly's fraudulent conduct. **See Delahanty**, 464 A.2d at 1257 ("Under Pennsylvania law, in an action based on fraud, the measure of damages is 'actual loss', and not the benefit, or value, of that bargain. The victim is entitled to all pecuniary losses which result as a consequence of his reliance on the truth of the representations.") (citations omitted). Thus, given the argument and authority set forth by Hunly, we reject its claim that Longwood had to establish the fair market value of its renovations when proving damages.

Similarly, Hunly's claims that Kassalen ignored various business expenses that Hunly had paid, and relied on an inappropriate study, also do not warrant relief. It is well-established that:

> The determination of damages is a factual question to be decided by the fact-finder. This duty of assessing damages is within the province of the fact-finder and should not be interfered with unless it clearly appears that the amount awarded resulted from partiality, caprice, prejudice, corruption or some other improper influence. The fact-finder must assess the worth of the testimony, by weighing the evidence and determining its credibility, and by

accepting or rejecting the estimates of the damages given by the witnesses. In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence.

*Lokay v. Lehigh Valley Co-op. Farmers, Inc.*, 492 A.2d 405, 410 (Pa. Super. 1985) (citations omitted).

At trial, the court heard that, in calculating damages, Kassalen used the industry average gross profit percentage for commercial and institutional building contractors, instead of the average for residential remodelers. N.T. Trial, 3/8/19, at 1126, 1140-44. Kassalen explained that he chose the commercial-and-institutional-building-contractors average because, among other reasons, he thought it best aligned with Hunly's business. *See id.* at 1140. In comparison, he said that he took residential remodelers to mean "a residential development like a home[,]" and did not believe that Hunly was a residential remodeler *Id.* at 1143. The trial court also heard that the industry average gross profit percentage used by Kassalen was a national average, not a western Pennsylvania average, and that many variables affect markup, such as project size, the type of work performed, business size, etc. *See id.* at 1008-10, 1138-39, 1150-52, 1169. However, Kassalen noted that RMA data is generally relied upon by him and his construction-accounting peers, and detailed that "companies provide[] their financial statements to RMA. RMA pulls their financial statements into whatever software they would use, and it is based on all of the companies' submissions to RMA." *Id.* at 1127-28. Kassalen also clarified that, when calculating Hunly's contract costs, he did

not include expenses recorded by Hunly but not supported by either an invoice or a check. *Id.* at 1157-59, 1193-94. In doing so, Kassalen explained that Hunly "could put whatever they want in their general ledger detail[,]" and relayed that he could not find supporting paperwork for some expenses despite looking for it. *Id.* at 1193-94.

As the fact-finder, the trial court weighed this evidence and accepted the estimates of the damages given by Kassalen for the reasons mentioned *supra*. Because we discern no error of law or partiality, caprice, prejudice, corruption or some other improper influence with respect to the trial court's award, and given that there is support for the trial court's award in the record, we decline to disturb it.[9]

_____

[9] With respect to Hunly's claim that Kassalen did not account for $20,000.00 that Hunly had paid Abbey Glass in his calculations, we deem that claim waived, as it is not developed properly for our review. *See* Hunly's Brief I at 21 (stating, without any further explanation, that "[a] similar instance of Kassalen's errors is that he did not include $20,000.00 that [Hunly] paid Abbey Glass, a supplier [for] Longwood['s] renovations"). The only support that Hunly provides in its argument for this claim is a citation to a single page in the trial transcript, which contains Aufman's testimony that Abbey Glass had billed both Longwood and Hunly for the same work in the amount of $20,000.00, and that both entities subsequently paid Abbey Glass that amount. N.T. Trial, 3/11/19, at 1279-80. Aufman testified that he believed that Abbey Glass kept the check from Hunly and returned the other check to Longwood. *Id.* at 1280. However, Hunly offers no additional elaboration or corroboration on this claim and does not even discuss the page of the trial transcript it cites. Accordingly, this claim is waived. *Milby v. Pote*, 189 A.3d 1065, 1079 (Pa. Super. 2018) ("The failure to develop an adequate argument in an appellate brief may result in waiver of the claim under Pa.R.A.P. 2119. We shall not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument; instead, we will deem the issue to be waived.") (cleaned up); *In re R.D.*, 44 A.3d 657, 674 (Pa. Super.
*(Footnote Continued Next Page)*

**Hunly's Second Issue**

In Hunly's second issue, it argues that the facts and law do not support the trial court's finding of conspiracy. It contends that, "[g]iven Longwood's failure to prove actual legal damage, its conspiracy claims should also have failed." Hunly's Brief I at 22 (citation omitted). In addition, it advances that "[t]he trial record revealed no common unlawful purpose or agreement involving [Hunly] to do an unlawful act or to do a lawful one for an unlawful purpose. There was no proof of any overt act in pursuance of some unlawful purpose." *Id.* at 22-23 (citations omitted). We disagree.

"The essential elements of a claim for civil conspiracy are as follows: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage." *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. 2008) (citations omitted). The trial court determined that Hunly participated in a civil conspiracy, opining:

> This [c]ourt finds that the various and numerous overt misrepresentations and concealments of fact made by McCollum, Hunly, Sepcic, and Aufman[] were done with the common purpose of fraudulently inducing Longwood to engage Hunly as a general contractor and in accepting its extremely overpriced bids. Additionally, McCollum and Aufman's deliberate

2012) ("[I]t is an appellant's duty to present arguments that are sufficiently developed for our review. The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities. We will not act as counsel and will not develop arguments on behalf of an appellant.") (citations and quotation marks omitted).

misrepresentations regarding the apparent conflict of interest was intended to fraudulently induce Longwood to keep Hunly as its general contractor. Therefore, this court properly found that McCollum, Aufman, Hunly and Sepcic unlawfully conspired against Longwood, and hence [are] liable for the same.

TCO at 18.

We concur with the trial court's analysis. Hunly acted with McCollum, Aufman, and Sepcic to commit fraud. They worked together to convince Longwood that Hunly was an experienced general contractor, had no conflicts of interest, and charged fair prices. Further, for the reasons set forth *supra*, Longwood sustained actual legal damage as a result, in that it substantially overpaid for Hunly's services. As the record supports the trial court's findings of fact, and because the elements of civil conspiracy have been established, no relief is due on this basis.

**Hunly's Third Issue**

In Hunly's third issue, Hunly insists that Longwood waived its claims against it. It argues that Longwood learned that McCollum and Hunly had a pre-existing association in October of 2014, and concluded that it was being overcharged by Hunly in May of 2015. Hunly's Brief I at 24. Despite this information, Hunly says that Longwood "chose to ignore any alleged overcharge and to remit payment to [Hunly] in June and July of 2015." *Id.* (citation omitted). According to Hunly, "Longwood's actions of continuing to use [Hunly's] services and continuing to pay [Hunly,] after knowing of the parties' associations and after believing [Hunly] was overcharging[,] are inconsistent with Longwood's later assertion that the [Hunly-Longwood]

contracts and [Hunly] invoices were invalid because of fraud, conspiracy, or any other wrong." *Id.* at 25. By continuing to use and pay Hunly, Hunly claims that Longwood "waived any claim to recover amounts from [Hunly] for fraud, conspiracy, or any other civil wrong." *Id.* at 25-26 (citations omitted).

Again, we disagree. Our Supreme Court has stated:

A waiver in law is the act of intentionally relinquishing or abandoning some known right, claim or privilege. To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it[.] Waiver is essentially a matter of intention. It may be expressed or implied. In the absence of an express agreement[,] a waiver will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his conduct the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended or consented to. In short, the doctrine of implied waiver in Pennsylvania applies only to situations involving circumstances equivalent to an estoppel, and the person claiming the waiver to prevail must show that he was misled and prejudiced thereby[.]

*Brown v. City of Pittsburgh*, 186 A.2d 399, 401 (Pa. 1962) (cleaned up; footnotes omitted).

In response to Hunly's waiver argument, Longwood persuasively counters:

The [t]rial [c]ourt correctly found that the anonymous letter was not sufficient to put Longwood on notice of the fraud that was taking place at the hands of Hunl[y] and its co-conspirators. Without such knowledge, there can be no waiver. Longwood did not even know it was being defrauded, so it could not possibly have waived any rights, claims, or defenses with respect thereto.

The reason why Longwood continued to use Hunl[y] after receipt of the anonymous letter was because it had investigated the allegations in the letter at the time and determined them (albeit erroneously) to be unfounded. Only after years of litigation and

extensive forensic investigation did Longwood become aware of the nature and extent of the fraudulent conspiracy that had victimized it. Again, the [t]rial [c]ourt agreed that Longwood went above and beyond what the law required in order to continue justifiably relying on Hunl[y], Aufman, Sepcic, and McCollum's misrepresentations.

Similarly, the reason why Longwood continued to pay Hunl[y] … was because Longwood reasonably believed at the time (again, erroneously) that it had a contractual obligation to do so. At the time, while Longwood may have been "suspicious" that Hunl[y] was overcharging it, the scope and scale of Hunl[y]'s fraud remained concealed. John Bulger, who had replaced McCollum as the head of the unit turnovers at Longwood, was new to the job and faced with angry, unpaid Subcontractors threatening work stoppages, Aufman's threats of litigation and continued withholding of support for Hunley's over-inflated invoices, and residents ready to move into incomplete units. Under those circumstances, Bulger and Longwood rightly believed that they had no choice but to pay Hunl[y]. When they did, Hunl[y] persisted in its failure to pay the Subcontractors.

Under these circumstances, no waiver of any kind can be imputed to Longwood.

Longwood's Brief at 672 WDA 2021 at 50-52 (internal citations omitted).

As Longwood aptly points out, because it did not have full knowledge of Hunly's fraud at the time it received the anonymous letter and when it made payments to Hunly in June and July of 2015, it could not act to intentionally relinquish or abandon its claims against Hunly. Put simply, Longwood did not realize at the time the existence and extent of Hunly's fraud, such that it could have knowingly waived its claims against Hunly. *See* N.T. Trial, 3/11/19, at 1371-73 (John Bulger's testifying that, as of June 18, 2015, he knew Hunly overcharged on some things, but did not know the size and scope of the overcharges); *see also id.* at 1402-03 (similar); N.T. Trial, 3/6/19, at 670

(PSC's Chief Financial Officer's testifying that, in May of 2015, Longwood did not know what Hunly's overcharge was, but that John Bulger surmised that "there [were] costs exceeding what he would normally receive for the scope of work being completed"). Further, with respect to the June and July of 2015 payments, there was testimony at trial that Longwood made these payments to Hunly so that Hunly would pay the Subcontractors. *See* N.T. Trial, 3/6/19, at 663-65, 671; N.T. Trial, 3/11/19, at 1351, 1373-74, 1394-95. Thus, even if Longwood fully knew of its claims against Hunly at that point (which it did not), we do not view Longwood's paying Hunly so that Hunly could pay the Subcontractors as a 'clear, unequivocal and decisive act' that Longwood wished to surrender its rights. Finally, we are unconvinced that Hunly was misled by any of Longwood's actions to its prejudice. Therefore, this claim likewise lacks merit.

In sum, none of Hunly's claims in its appeal at docket number 672 WDA 2021 are meritorious. Consequently, we affirm the trial court's May 11, 2021 judgment at GD 15-015968 with respect to Hunly.

## Aufman's Appeal at 673 WDA 2021

We next examine Aufman's appeal at docket number 673 WDA 2021. In this appeal, Aufman presents the following issues for our review:

1. Do the record facts and law support the trial court's finding of fraud by … Aufman?

2. Do the record facts and law support the trial court's finding of conspiracy by … Aufman?

3. Did Longwood waive its claims against Aufman?

4. Do the record facts and law support the trial court's decision to disregard [Hunly's] corporate form and impose personal liability on … Aufman?

Aufman's Brief at 7.[10, 11]

**Aufman's First Issue**

In Aufman's first issue, he contests the trial court's finding of fraud against him. His arguments pertaining to fraud are virtually identical to those raised by Hunly, *supra*.[12] Thus, we rely on our reasoning set forth above in disposing of Aufman's first issue. **See** Hunly's First Issue at 672 WDA 2021, ***supra*.**[13] No relief is due on this basis.

---

[10] We have re-ordered Aufman's issues for ease of disposition.

[11] With respect to Aufman's appeal, Longwood similarly asserts that it should be quashed due to its breadth, vagueness, and non-compliance with our Rules of Appellate Procedure. However, for the reasons we declined to quash Hunly's appeal, we likewise refuse to quash Aufman's appeal. **See** footnote 7, ***supra***. Nevertheless, we rebuke him for failing to follow the Rules.

[12] Aufman, Hunly, and Sepcic are represented by the same attorney on appeal.

[13] Specifically with respect to Aufman, Longwood notes:

> Aufman was at all times the "face" of Hunl[y] — Sepcic in fact did not communicate with Longwood at all until July of 2015. The Court should recall that McCollum was the "inside man" who was employed by Sodexo to work at Longwood as facilities manager. Aufman, meanwhile, sent virtually all of the correspondence on behalf of Hunl[y], prepared all the fraudulent, over-inflated invoices, and controlled Hunl[y]'s bank accounts. Aufman also perpetrated two blatantly false, yet extremely material, misrepresentations to Longwood; specifically: (1) Aufman lied when he wrote in an email that "John McCollum does not hold any financial interest in my company (ies) as an investor, or as an employee, or any other way"[, **see** N.T. Trial, 3/6/19, at 450]; and (2) Aufman told John Bulger that, if Bulger issued Hunl[y]

*(Footnote Continued Next Page)*

- 32 -

**Aufman's Second Issue**

In Aufman's second issue, he questions whether the facts and law support the trial court's finding of conspiracy against him. Similar to Aufman's first issue, his arguments relating to conspiracy effectively duplicate those set forth by Hunly, *supra*. Therefore, we incorporate our reasoning provided above in resolving Aufman's second issue. **See** Hunly's Second Issue at 672 WDA 2021, **supra**. No relief is due on this basis either.

**Aufman's Third Issue**

In Aufman's third issue, he avers that Longwood waived its claims against Aufman. Once again, his argument relating to this issue largely mirrors the argument raised by Hunly above. As a result, we deny Aufman's waiver argument for the reasons stated in our previous analysis of this issue. **See** Hunly's Third Issue at 672 WDA 2021, **supra**.

**Aufman's Fourth Issue**

In Aufman's fourth issue, he challenges whether the facts and law support the trial court's decision to disregard Hunly's corporate form and impose personal liability on Aufman. **See** Aufman's Brief at 25. He initially contends that "[b]ecause Longwood did not demonstrate an underlying civil wrong for which [Hunly] or anyone is liable, and because Longwood did not

---

payment for some outstanding (but fraudulent) invoices, Hunl[y] and Aufman would then use that money to pay the Subcontractors, which, of course, they did not.

Longwood's Brief at 673 WDA 2021 at 36-37 (internal citations omitted).

show that any actionable wrong caused damages, Longwood gave the court no legal reason even to consider disregarding [Hunly's] corporate [form]." *Id.* As such, Hunly purports that "[t]he question of whether to disregard [Hunly's] corporate form was moot." *Id.* (citation omitted). In addition, Aufman maintains that Longwood "did not show that [Hunly] was a sham or façade such that its corporate form should be overlooked." *Id.* at 25-26 (citation omitted). Rather, Aufman says that Hunly "is a duly organized corporation which was engaged in properly profitable business with Longwood. … The fact that [Hunly] consists of only two shareholders and/or has subsequently experienced financial problems unrelated to the Longwood contracts are of no moment." *Id.* at 26 (citations omitted). Aufman also states that Longwood failed to show "unusual and specific circumstances to disregard [Hunly's] corporate status." *Id.* (citation omitted). Last, Aufman advances that, "[e]ven if [Hunly] did wrong, there was no basis to blame Aufman." *Id.*

With respect to piercing the corporate veil, our Supreme Court has recognized:

> There is a strong presumption in Pennsylvania against piercing the corporate veil. Any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception.
>
> > Piercing the corporate veil is … a matter of equity, allowing a court to disregard the corporate form and assess one corporation's liability against another. The corporate veil will be pierced and the corporate form disregarded whenever justice or public policy demand, such as when the corporate form has been used to defeat public convenience, justify wrong, protect fraud, or defend crime.

The corporate form thus may be disregarded where rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless.

In **Ashley** [**v. Ashley**, 393 A.2d 637, 641 (Pa. 1978)], we held that the corporate form may be disregarded "whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests." And in **Lumax**[ **Indus., Inc. v. Aultman**, 669 A.2d 893, 895 (Pa. 1995)], we cited favorably the Commonwealth Court's enumeration of factors relevant to the piercing inquiry: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs, and use of the corporate form to perpetrate a fraud."

**Mortimer v. McCool**, 255 A.3d 261, 268 (Pa. 2021) (footnotes, brackets, and most quotation marks omitted).

In the case *sub judice*, the trial court discerned that piercing the corporate veil of Hunly was warranted, relaying:

This [c]ourt finds that justice and public policy demand piercing Hunl[y]'s veil. The circumstances of this case show that neither innocent parties will be prejudiced nor is the theory of corporate entity undermined. Further, the factors of this case are sufficient to defeat the presumption against veil piercing.

Hunl[y] was formed solely as part of the fraudulent scheme for McCollum to extract money from Longwood. Hunl[y] was hired [as] a general contractor while McCollum, who was already receiving payment from Sodexo for his services to Longwood, performed all the tasks associated with that role. Hunl[y] did no actual work whatsoever. Further, Hunl[y] was mainly financed through a loan from John McCollum's company, W.F. Cody Corp. Longwood was Hunl[y]'s sole client and source of revenue. Most of that revenue funneled back to John McCollum. Now Hunl[y] is insolvent and has no way of paying its creditors or satisfying any judgment against it. It is clear that Aufman and Sepcic never had an intent to use Hunl[y] for a legitimate business end. Hunl[y] began operating before it was even incorporated. Further, there was substantial intermingling of corporate and personal affairs. The company was operated out of Aufman's accounting office and shared staff with Aufman's other business enterprises. Those staff

members were not compensated by Hunl[y], but instead by Aufman's accounting firm. Hunl[y] never had actual employees other than John McCollum's son, an unpaid intern that wrote checks to his own company in the amount of $975,000.00.

It is inequitable and unjust for McCollum, Aufman, and Sepcic to make use of the corporate form to escape their liability for their participation in fraud. This [c]ourt finds that piercing Hunl[y]'s veil would not undermine the theory of the corporate form. To the contrary, this [c]ourt can find no legitimate business end that would justify preserving Hunl[y]'s corporate form. No innocent parties will be harmed by piercing Hunl[y]'s veil, but the inverse is true; innocent parties will be harmed if there was no way to recover damages from Aufman and Sepcic for their contribution to the fraudulent scheme. Therefore, this [c]ourt finds that factors weighing in favor of piercing the corporate veil are sufficient to overcome the presumption against veil piercing.

TCMNV at 22-23 (internal citations omitted).

We agree with the trial court's above-stated analysis. Aufman, Sepcic, and McCollum created and used Hunly to perpetrate a fraud. Given the circumstances of this case, justice demands piercing Hunly's veil.

In conclusion, none of Aufman's issues in his appeal at docket number 673 WDA 2021 warrant relief. We therefore affirm the trial court's May 11, 2021 judgment at GD 15-015968 with respect to Aufman.

## **Sepcic's Appeal at 675 WDA 2021**

We next turn to Sepcic's appeal at 675 WDA 2021. He presents the following questions for our review:

1. Do the record facts and law support the trial court's finding of fraud by … Sepcic?

2. Do the record facts and law support the trial court's finding of conspiracy by … Sepcic?

3. Did Longwood waive its claims against Sepcic?

- 36 -

4. Do the record facts and law support the trial court's decision to disregard … Hunly's corporate form and impose personal liability on … Sepcic?

Sepcic's Brief at 7.[14, 15]

### Sepcic's First Issue

In Sepcic's first issue, he challenges the trial court's finding of fraud against him. Like Aufman, Sepcic's arguments with respect to this issue are largely the same as those raised by Hunly. Thus, we apply the reasoning we employed in disposing of Hunly's first issue. *See* Hunly's First Issue at 672 WDA 2021, *supra.*[16] This issue lacks merit.

### Sepcic's Second Issue

---

[14] As with Aufman, we have re-ordered Sepcic's issues to facilitate our disposition.

[15] As with Hunly and Aufman, Longwood similarly requests that Sepcic's appeal be quashed. We continue to decline to do so but chastise him for his failure to follow our Rules. *See* footnote 7, *supra*.

[16] Regarding Sepcic, Longwood points out that:

> Sepcic was the first person that McCollum approached about "forming a construction company." Specifically, it was McCollum who told Sepcic to contact Aufman to further this objective. After he was installed as Sodexo's on-site manager at Longwood, McCollum contacted Aufman and Sepcic[,] and asked them if they wanted to do contracting work for PSC. Sepcic was a founding shareholder of Hunl[y] and owned 80% of the company. Then, near the end of the scheme, it was Sepcic who sent fraudulent collection letters to Longwood, demanding payment of Hunl[y]'s over-inflated invoices. [*See* N.T. Trial, 3/12/19, at 1616-18.]

Longwood's Brief at 675 WDA 2021 at 37 (internal citations omitted).

In Sepcic's second issue, he claims that the trial court's conspiracy verdict was unsupported by fact and law. Again, his arguments on this issue essentially mirror those raised by Hunly. As such, in addressing this issue, we rely on our analysis pertaining to Hunly's conspiracy argument. ***See*** Hunly's Second Issue at 672 WDA 2021, ***supra***. No relief is granted.

### Sepcic's Third Issue

In Sepcic's third issue, he says that Longwood waived its claims against him. Once more, his arguments echo those raised by Hunly. We therefore apply our above-stated waiver analysis to Sepcic's third issue. ***See*** Hunly's Third Issue at 672 WDA 2021, ***supra***. Longwood did not waive its claims.

### Sepcic's Fourth Issue

In Sepcic's last issue, he questions the trial court's decision to impose personal liability on him, disregarding Hunly's corporate form. He reiterates Aufman's arguments for why the trial court should not have done so. Thus, we reject Sepcic's issue on the same basis that we rejected Aufman's claim. ***See*** Aufman's Fourth Issue at 673 WDA 2021, ***supra***.

Overall, none of Sepcic's issues at docket number 675 WDA 2021 merit relief. We consequently affirm the trial court's May 11, 2021 judgment at GD 15-015968 as it relates to Sepcic.

### <u>Hunly's Appeal at 671 WDA 2021</u>

Finally, we reach Hunly's appeal at 671 WDA 2021. There, Hunly poses the following questions for our review, which we have re-ordered for ease of disposition:

1. Do the record facts and law support the trial court's finding of fraud and/or conspiracy by [Hunly] such that Longwood is somehow excused from paying for construction work it received?

2. Did Longwood waive any purported defense to [Hunly's] causes of action?

3. Did the trial court err both factually and legally by failing to find that Longwood breached its contracts with [Hunly]?

4. Did the trial court err both factually and legally by failing to find that Longwood was unjustly enriched?

5. Did the trial court err both factually and legally by failing to find that Longwood violated the [CASPA]?

Hunly's Brief at 671 WDA 2021 ("Hunly's Brief II") at 7.[17]

**Hunly's First, Second, and Third Issues**

In Hunly's first, second, and third issues, Hunly essentially questions the trial court's determination that Longwood did not breach its contracts with Hunly. In reaching this conclusion, the trial court explained:

Longwood did not breach its contracts because the contracts for which Longwood has not yet paid are void. Fraud in the inducement renders a contract voidable at the option of the defrauded party. ***Stringert & Bowers, Inc. v. On-Line Sys., Inc.***, 345 A.2d 194, 196 ([Pa. Super.] 1975). This [c]ourt has already made a finding of fraud against all [d]efendants including Hunl[y]. Therefore, Hunl[y]'s fraud makes the contracts voidable at Longwood's option. Longwood has only chosen to exercise that option for the contracts that have not yet been paid.

TCMNV at 26-27 (internal citation omitted).

Hunly argues that the record facts and law do not support the trial court's findings of fraud and conspiracy, for the same reasons it advanced in

_____

[17] Again, Longwood asks that we quash Hunly's appeal at 671 WDA 2021, because of its non-compliance with our Rules. Again, we decline to do so. ***See*** footnote 7, ***supra.***

its appeal at 672 WDA 2021, *supra*. Hunly's Brief II at 25-31. Further, it insists again that Longwood waived defenses to Hunly's causes of action by continuing to use and pay for Hunly's services through July of 2015. *Id.* at 31-34. Finally, it asserts that the trial court erred in failing to find that Longwood breached its contracts with Hunly, as "[t]he evidence showed that [Hunly] performed and completed the agreed-upon work and submitted proper invoices." *Id.* at 23. It claims that Longwood owes it $910,538.25. *Id.* at 23-24.

We discern no error committed by the trial court. As the trial court points out, this Court has recognized that "[t]he general rule, of course, is that fraud in the inducement renders a contract voidable at the option of the defrauded party." *Stringert & Bowers, Inc.*, 345 A.2d at 196 (citations omitted). *See also Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1184 (Pa. Super. 2005) ("Our Supreme Court and this Court have consistently held that the victim of fraud in the inducement has two options: (1) rescind the contract, or (2) affirm the contract and sue for damages.") (citations omitted)). We have already upheld the trial court's determination that Hunly committed fraud. *See* Hunly's First Issue at 672 WDA 2021, *supra*. Thus, we agree with the trial court that Longwood could void its agreements with Hunly, and therefore, did not breach any contract.[18]

_____

[18] Even if there was an enforceable contract, Longwood rightly points out that "Hunl[y] did not perform any actual 'general contracting services' — it just
*(Footnote Continued Next Page)*

**Hunly's Fourth Issue**

In Hunly's fourth issue, it argues that the trial court erred by failing to find that Longwood was unjustly enriched. It argues:

> In the event that this Court determined that [the Hunly-]Longwood contracts were not valid as to any unpaid [Hunly] invoices, [Hunly] is entitled to damages for unjust enrichment. There was no dispute at trial that [Hunly] completed the work at issue. There was no dispute that [the] Subcontractors worked on the projects for which they should be paid. Peterson testified that the prices set forth in [Hunly's] invoices were reasonable. [Hunly] conferred a benefit upon Longwood that it would be unjust for Longwood to retain without payment for value. The value is the amount on the invoice for work that was undisputedly performed and completed, specifically $910,538.25.

Hunly's Brief II at 24 (internal citation omitted).

We reject Hunly's argument. "Unjust enrichment is an equitable remedy, defined as 'the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, and for which the beneficiary must make restitution.'" ***Commonwealth by Shapiro v. Golden Gate National Senior Care LLC***, 194 A.3d 1010, 1034 (Pa. 2018) (citation omitted). Here, Hunly did not confer any benefit upon Longwood, as it performed no actual work. Further, the Subcontractors — who performed work but were not paid — sued certain parties, including Longwood, in the action at GD 18-012048 to recover the

---

used McCollum[, a Sodexo employee,] to distribute work to subcontractors and then sent Longwood over-inflated invoices. Hunl[y] did no work and as such could not have triggered any real or imagined contractual obligation for Longwood to pay money." Longwood's Brief at 671 WDA 2021 at 54-55 (citations omitted).

money they are owed. Therefore, giving Hunly money so that it can purportedly pay the Subcontractors is unnecessary at this juncture.[19] In addition, we agree with the trial court's observation that Hunly's own actions bar it from receiving equitable relief:

> Hunly's unjust enrichment claims are dismissed because Hunl[y] comes with unclean hands. A court may deprive a party of equitable relief where, to the detriment of the other party, the party applying for such relief is guilty of bad conduct relating to the matter at issue. *In re Estate of Aiello*, 993 A.2d 283, 288 (Pa. Super. … 2010). This [c]ourt finds that Hunl[y]'s fraud precludes equitable relief.

TCMNV at 27. Thus, for the foregoing reasons, Hunly's unjust enrichment argument fails.

### Hunly's Fifth Issue

Finally, in Hunly's fifth issue, it states that the trial court erred by not finding Longwood liable under CASPA.[20] Under CASPA, Hunly contends that "Longwood is liable to [Hunly] for its claims discussed earlier in this brief, plus

---

[19] We also recognize that Longwood has previously given money to Hunly so that Hunly would pay the Subcontractors, only to have Hunly fail to do so. *See* TCO at 7 ("[W]hile Bulger's investigation of the Hunly invoices remained ongoing, Longwood began issuing large checks to Hunly in reliance upon Hunly's promise to pay the Subcontractors within seven (7) to ten (10) days. Nevertheless, despite receiving $613,069.50 from Longwood after McCollum left, Hunly did not pay the Subcontractors and continued to demand more money from Longwood.").

[20] By way of background, CASPA "protect[s] contractors and subcontractors against not being paid promptly for the work and materials they provide on a construction project." *East Coast Paving & Sealcoating, Inc. v. North Allegheny School Dist.*, 111 A.3d 220, 230 (Pa. Cmwlth. 2015) (citations omitted).

a penalty at the rate of 1% per month[,] plus reasonable attorneys' fees[,] pursuant to 73 P.S. § 512." Hunly's Brief II at 25.

Again, no relief is due. Section 512 sets forth:

**(a) Penalty for failure to comply with act.--**

(1) If arbitration or litigation is commenced to recover payment due under this act and it is determined that an owner, contractor or subcontractor has failed to comply with the payment terms of this act, the arbitrator or court shall award, in addition to all other damages due, a penalty equal to 1% per month of the amount that was wrongfully withheld.

(2) An amount shall not be deemed to have been wrongfully withheld if all of the following apply:

(i) The amount bears a reasonable relation to the value of any claim held in good faith by the owner, contractor or subcontractor against whom the contractor or subcontractor is seeking to recover payment.

(ii) The claim holder complies with section 6 or 11.

**(b) Award of attorney fee and expenses.--**Notwithstanding any agreement to the contrary, the substantially prevailing party in any proceeding to recover any payment under this act shall be awarded a reasonable attorney fee in an amount to be determined by the court or arbitrator, together with expenses.

73 P.S. § 512 (footnote omitted).

Because Hunly has no valid claim for payment, it is not entitled to the penalties and attorneys' fees provided for in Section 512. *Accord* TCMNV at 27 ("Hunl[y]'s [CASPA] claim is contingent on Hunl[y]'s success in its breach of contract or unjust enrichment claims. Since this [c]ourt has found[] for Longwood on both counts, the [CASPA] claim also fails."). No relief is warranted on this basis.

In sum, Hunly's appeal at docket number 671 WDA 2021 lacks merit. Accordingly, we affirm the trial court's May 11, 2021 judgment at GD 17-001195.

Judgment at GD 15-015968 affirmed. Judgment at GD 17-001195 affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  2/27/2023